■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT J. WOFFORD, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Kings County, rendered July 11, 1974, convicting him of murder and possession of weapons, etc., as a misdemeanor, after a nonjury

trial, and imposing sentence. Judgment affirmed. No opinion. Hopkins, J. P., Rabin and Hawkins, JJ., concur; O'Connor, J., dissents and votes to reverse the judgment and remit the case to the Criminal Term for an appropriate disposition, with an opinion. O'Connor, J. (dissenting). The defendant appeals from a judgment of the Supreme Court, Kings County, rendered July 11, 1974, convicting him, after a nonjury trial, of murder and possession of weapons, etc., as a misdemeanor. The defendant is presently serving a sentence of 20 years to life on the murder charge.

## FACTS

Within a very short time following the commission of the crime, the then 16-year-old defendant made two confessions—one to the police and one to an Assistant District Attorney. Following a *Huntley* hearing, the defendant's motion to suppress was denied. The defendant confessed that, in connection with his job as a porter, he had been instructed to install window screens in the apartment of one of the tenants, a Ms. Schwartz. He stated that she "started to call me this sexy name." In response to the question, "What did she call you?", he replied: "Hey baby, hi sexy, and all that * * * I told her that I didn't like those names. She just kept calling me those names." He told her to stop and when she did not, he dragged her into the bedroom and repeatedly hit her with his fists about the head, face and body until she fell to the floor. He hit her head on the floor about 10 times and "she just lay there burping blood." He ran to the kitchen, got a knife, stabbed her three times and, in the process, inflicted a severe cut on his hand. Wrapping his hand in a towel from the bathroom and leaving the knife stuck in the buttock of his unfortunate victim, he ran down the five flights of stairs to the basement, out to the street and into a building which he took to be a hospital. In fact, it was a firehouse and he told a man there that he had cut his hand on barbed wire. Another fireman took him to a hospital where he gave a false name and address and a different account of how he received his injury. The confession continues that the defendant went home and told his mother that he had been chased by some boys who were themselves being chased by the police and that he fell on a plastic bag which had glass in it. The defendant further stated in his confession that he did not intend to have sex with the woman, but that he was just mad at her and that he had pulled her clothes half off when he started hitting her. Through police and medical witnesses, the autopsy report and other supportive testimony and evidence, and buttressed by the presumption of sanity, the People quickly established a prima facie case and rested.

## THE ISSUE

The only defense was a plea of not guilty by reason of insanity and the sole issue thus presented was whether the defendant was criminally responsible within the framework of section 30.05 of the Penal Law. A short summary of the expert medical testimony* presented by both sides follows.

## FOR THE DEFENSE

Dr. William David Jeffrey, a director at Kings County Hospital in charge of supervising psychiatric residents, testified that he had examined the defendant on a prior commitment (which will be discussed *infra*) and that

---

* There is not here set forth any in-depth review of the voluminous medical and psychiatric testimony adduced upon the trial, but only an abbreviated resume of some of its highlights.

he made a diagnosis of "schizophrenic-paranoid type." Dr. Jeffrey noted that at that time (1970) the defendant had been having auditory hallucinations telling him to follow women, threaten them and commit rape. The witness concluded that the defendant's condition then was "very severe" and that the hallucinations were of "an aggressive or dangerous nature which could lead to homicide." Addressing himself to the instant case, it was Dr. Jeffrey's opinion that as a result of the defendant's mental disease, he might have seen a sexual invitation where in fact there was none and that the fact that the defendant gave false explanations of the incident and a false name and story to the police would not in any way change his opinion of the defendant's mental condition. His opinion was that at the time of the crime, the defendant did not know or appreciate the nature and quality of his act or that it was wrong. He stated that, under the circumstances, the defendant: "became psychotic during this period of time, felt the woman is making these very threatening sexual advances toward him and felt he must destroy this woman, that he must actually destroy the wishes within him, which he projected out onto the woman and flew into an uncontrollable psychotic rage and killed the woman. During this time he was quite unaware of the actual reality of the situation." The next witness for the defendant, Dr. Lawrence Abt, a clinical psychologist since 1939 and the author of many books and articles, with extensive experience in the field of projective tests, testified that he had examined all of the test reports and records in the defendant's file and that his own diagnosis was that of paranoid-schizophrenia. He said that the defendant was "suffering from a profound disorder in the area of impulse control." In agreement with Dr. Jeffrey, he stated that his opinion would not be changed by the facts of the defendant leaving the apartment, giving false accounts about his cut hand, using a false name and age and confessing. The defendant's final medical witness, Dr. Milton V. Kline, a clinical psychologist and the author of many articles and books, mostly in the field of hypnosis, testified that he had examined the defendant for a total of 9 or 10 hours, using hypnosis as an investigative tool. It was his opinion that the defendant was not criminally responsible and the facts of the defendant's flight, false stories and confession would not change his opinion. In full agreement with Dr. Jeffrey, the witness concluded that it was possible that the defendant had perceived a sexual invitation from his victim, which in fact had not been made, and that words of invitation would be "confused in this case by Robert Wofford as a provocation and instead of being received favorably, they would produce rage, anger, oppression and violence."

REBUTTAL TESTIMONY

Dr. Raymond Chaitin, a psychiatrist attached to Kings County Hospital with some 35 years of experience as a practicing psychiatrist and medical school professor, testified that he examined the defendant and his records, and concluded that the defendant had an "Antisocial personality disorder with some paranoid personality traits." But after conducting all of the proper tests, he concluded that "There was absolutely no mental disease or defect in which he's lacked substantial capacity to know or appreciate either the nature of his conduct or whether the act he did was wrong or not." The weight of Dr. Chaitin's testimony was, however, demonstrably diminished when he stated that he administered the so-called "Holzman Test", in which the subject is shown a paper clip on a string and his eye tracking is observed. According to Dr. Chaitin, schizophrenics are unable to track normally and the defendant's responses were perfectly normal. On direct

examination he stated that this test was accurate in 90% of the cases, but on cross-examination he admitted that it was a research test which could not be described in texts because it is not "finally acceptable." It was Dr. Chaitin's opinion that the defendant was simply a rapist. When asked about that portion of the defendant's confession in which he related that the victim had called him "hey baby" and "hey sexy", as a result of which he "pulled her by the collar and took her in the room and beat the mess out of her," Dr. Chaitin observed this to be the evidence of "a perfectly normal person, acting out sexual impulses." As to the defendant's description of the violent beating and stabbing of the deceased, it was Dr. Chaitin's opinion that it showed the defendant to be "perfectly normal." "This was a person acting out the sexual desires * * * a typical rapist type of picture, which one finds amongst rapists constantly." The witness stated: "So, I don't see any type of mental illness, not in the slightest." When asked by the trial court if his opinion would change if the medical examiner were to testify that there was no indication of rape or attempted rape, the witness responded: "Well, the attempt was because of his past patterns of two other cases that rape was desired. It was my feeling that Mr. Wofford never would have killed this woman if she wasn't menstruating. I think when he disrobed her and so forth, he became extremely frustrated because he did not carry out the act that he set himself out to carry out; that she was menstruating. This was found upon her autopsy and post, and this was why he killed her, because other woman who he did it to, I think the second case he got scared and broke off." With all due respect to the learned professor, this testimony is difficult to accept. The next rebuttal witness, Dr. Franklin Klaf, although he diagnosed the defendant as having an antisocial personality with paranoid traits, did not find any delusions of persecution or auditory hallucinations. Thus he found no evidence of paranoid-schizophrenia and stated that the defendant was not suffering from a mental disease or defect at the time of the crime. Mrs. Margaret Jurick, a staff psychologist at Kings County Hospital, found a great deal of pathology in the defendant. In her opinion, he views women as extremely threatening to him, and "this is a young man who could not relate to women, who hates them, who is extremely hostile to them, and who may have, or may feel some pressures to be aggressive toward them." The witness replied in the affirmative when asked whether the defendant "has the potential to kill, destroy a woman * * * under circumstances where his self image is threatened, and under circumstances, where his hostility, aggressiveness, suspiciousness and destructiveness burst forth". On cross-examination Mrs. Jurick, in response to an inquiry as to whether the defendant knew what was right or wrong, replied: I can have some ideas, but I *cannot have a definitive opinion"* (emphasis supplied). Upon this conflicting and confusing expert testimony, the trial court concluded "that the defendant was suffering * * * from a mental disease or defect. However, the court feels that the People have proved beyond a reasonable doubt that he had substantial capacity to know or appreciate either the nature and consequences of his conduct or that such conduct was wrong." The court found the defendant guilty as charged. But let us look more closely into the defendant's background as we take a short step backward into his prior psychiatric history. As previously noted, in 1970 he was committed to Kings County Hospital upon a most unusual and bizarre set of circumstances as was evidenced upon this trial by Miss Cynthia Valentino, who testified that on October 8, 1970, while she was in the ladies' room at her former place of employment in New York City, the defendant entered the room, closed the door, drew a knife and said: "Don't

scream or I'll kill you." Taking a piece of rope which he had concealed in a magazine, the defendant stated that he was going to tie her up. With quick presence of mind, Miss Valentino informed him that the cleaning woman was due at any moment and that he had better leave the premises forthwith. To this he responded that she had better not lie to him because "he had killed seven girls before, and he wouldn't hesitate to do it again." The witness then described what transpired in the ensuing moments: "at different points during this, he touched me, and at one point he kissed me, and after that, he said 'Will you marry me?' I said, 'yes, I will.' He said 'When?' I said, 'I don't care.' He said, 'Tonight?' I said, 'Okay,' and then he just started asking things like would I go to dinner with him and stuff like that, so I just kept saying this one thing over and over again, 'The cleaning woman is going to come, you'd better leave.' Okay, so eventually, I don't know if he believed me or what, but he said that he would leave and we would go somewhere else." Miss Valentino further testified that the defendant remained in the room for approximately 20 minutes and exposed himself, but was physically incapable of performing the sex act. They left the ladies' room and entered an office. Because of an interruption, the defendant abruptly ran out of the office. Fortunately, he was apprehended while still on the premises, was immediately arrested and, being a minor, was taken to the Family Court where he was examined by Dr. L. Levinstim, a psychiatrist. Dr. Levinstim's diagnosis was that the defendant was "mentally disturbed" with a "completely inappropriate" effect, smiling throughout the interview. The defendant told him that for five years he had been hearing voices which urged him to kidnap and attempt to rape women. Dr. Levinstim concluded that the defendant was a schizophrenic-paranoid type and transferred the case to Kings County Hospital where the defendant was examined by the same Dr. Jeffrey who testified at this trial. At that time, the defendant told Dr. Jeffrey that he had auditory hallucinations and that he struggled not to hear them by playing a radio loudly enough to drown them out. The defendant said that this technique was sometimes successful, but that when it was not, he would do what the voices told him to do. It was then and there that Dr. Jeffrey ominously and prophetically described the hallucinations as "of an aggressive and dangerous nature which could lead to homicide." The defendant spent the next 10 months in Queens Children's Hospital. Extracts from the records for that period are not only disturbing and significant, but tend to be dispositive. The record, in part recites: "December 8, 1970 * * * Robert seems to have little insight into his problems. His impulse control is poor and he does not understand the significance of his past behavior. * * * February 19, 1971 * * * He is still dangerous and should not yet be allowed weekend privileges. * * * September 8, 1971 [he] appears to be in remission from his acute psychotic decompensation." The defendant was discharged on October 1, 1971; the final diagnosis was "schizophrenia latent type." After his discharge the defendant was treated as an out-patient at Brooklyn State Hospital, where he was seen only seven times, the last visit being on February 3, 1972. He was terminated on May 18, 1972 and a short six weeks later, on July 2, 1972, this totally inexplicable and incredibly brutal, bizarre and bestial murder took place. One of the testifying medical experts had the extraordinary and invaluable advantage of having examined the defendant both *before* and *after* this horrible crime and his testimony must of necessity carry great weight. In my opinion it was Dr. Jeffrey who "told it as it was" when he testified that the defendant: "felt he must destroy this woman, that he must actually destroy the wishes within him, which he projected out onto

the woman and flew into an uncontrollable psychotic rage and killed the woman. During this time he was quite unaware of the actual reality of the situation." In the light of all of the foregoing, it becomes abundantly clear that the badly twisted, tortured and tormented mind of this tragic young man cries for compassion rather than censure, and that the only hope for both society and the defendant rests in intensive and protracted psychiatric treatment and care rather than behind prison bars. There is here presented a classic example that clearly illustrates the intent of the Legislature when, in the Revised Penal Law, effective September 1, 1967, it sought to soften the straitjacket rigidity of the ancient *McNaughton* rule as contained in section 1120 of the former Penal Law. Recognizing the realities of the vastly improved psychiatric knowledge of the times, the new law substituted a much broader concept of understanding in place of the old *McNaughton* word "know". In its stead the statute (subdivision 1 of section 30.05 of the Revised Penal Law) reads: "A person is not criminally responsible for conduct if at the time of such conduct as a result of mental disease or defect, he lacks substantial capacity to know or appreciate either: (a) The nature and consequences of such conduct; or (b) That such conduct was wrong." Under this new definition, it is quite clear, a sense of guilt is evidenced by concealment or by flight is not an adequate measure because it may reflect but a mere surface knowledge of the wrong done. An objective evaluation of the record before us leads to the irresistible conclusion that the defendant's murderous and barbaric response to a sexual invitation, real or fancied, was but an outpouring of a diseased and troubled mind and that the act was committed without any substantial awareness of its nature or that it was wrong. It cannot be gainsaid that after the killing the defendant had indeed some awareness that he had done a wrongful act—he tended and concealed his wound and gave false, conflicting and diverse accounts of his activites of the evening—yet it is precisely this sort of surface knowledge of the wrong done that, more often than not, is but a childlike consciousness, totally without depth or significance and completely divorced from true comprehension. The purpose for substituting the phrase "substantial capacity to know or appreciate" in place of the word "know" is carefully explained in the 1963 Second Interim Report of the Temporary Commission on the Revision of the Penal Law and Criminal Code (NY Legis Doc, 1963, No. 8, pp 18-19) in the following words: "There is, first, the difficulty that inheres in the ordinary meaning of the word 'know,' as applied to persons suffering from serious mental disease. The fact that the defendant is able to verbalize the right answer to a question, to respond, for example, that murder or stealing is wrong, or the fact that he exhibited a sense of guilt as by concealment or by flight, is often taken as conclusive evidence that he knew the nature and the wrongfulness of his behavior. Yet one of the most striking facts about the abnormality of many psychotics is that their way of knowing is entirely different from that of the ordinary person. In psychiatric terms, their knowledge is usually divorced from all affect, which is to say that it is like the knowledge children have of propositions they can state but cannot understand; it has no depth and is divorced from comprehension. The present statute makes it very difficult to put this point before the jury, though it often is the crucial point involved * * * The knowledge that should be deemed material in testing responsibility is more than merely surface intellection; it is the appreciation sane men have of what it is that they are doing and of its legal and its moral quality." Within this frame-

work, the People have failed to sustain the heavy burden of proving the guilt of the defendant beyond a reasonable doubt. Accordingly, the judgment of conviction should be reversed and the matter remanded to the Criminal Term for an appropriate disposition in accordance with the views expressed herein. Judgment affirmed.